# 24-2678-cv

## United States Court of Appeals

### *for the*

## Second Circuit

IN RE: PAYMENT CARD INTERCHANGE FEE AND
MERCHANT DISCOUNT ANTITRUST LITIGATION

This document refers to:

OLD JERICHO ENTERPRISE, INC. V. VISA, INC.,
No. 20-cv-2394 (E.D.N.Y.)(MKB)(JAM)

_____

*(For Continuation of Caption See Inside Cover)*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

DANIEL GIFFORD
COHEN MILSTEIN SELLERS
& TOLL PLLC
88 Pine Street, 14th Floor
New York, New York 10005
(212) 838-7797

*Attorneys for Plaintiffs-Appellants*

OLD JERICHO ENTERPRISE, INC., 32T, LLC, BUCKS, INC., CHANDLER OIL-1 CORPORATION, COFFEE CUP FUEL STOP, INC., H&H ENTERPRISES, INC., HEINZ ENTERPRISES, INC., KOEHNENS STANDARD SERVICE, INC., MINERAL SPRING AVENUE GETTY, INC., MOX LLC, OKY LLC, PIT ROW, INC., POINTE SERVICE CENTER LLC, RED EAGLE, INC., VICTORY ENERGY, LLC, VILLAGE CENTER AUTO CARE, INC., W.L.F. AUTOMOTIVE, INC., WESCO, INC., ZARCO USA, INC., on behalf of all others similarly situated,

*Plaintiffs-Appellants,*

– v. –

VISA, INC., MASTERCARD, INC.,

*Defendants-Appellees.*

# TABLE OF CONTENTS

INTRODUCTION ................................................................1

ARGUMENT ....................................................................4

I.    *Fikes* Means What It Says ........................................4

    A.    *Fikes*'s Language and Reasoning Make Clear That Its "Direct Payor" Test Controls ...........................4

    D.    Plaintiffs' Experiences in the Claims Administration Process Demonstrate that the Settlement Does Not Include Them .............................21

II.    Defendants Have Waived Any Argument That Plaintiffs *Are* Direct Payors .......................................26

III.    Defendants Are Estopped from Disputing That *Fikes*'s Direct Payor Test Controls ....................................28

IV.    Even on Its Own Terms, the District Court's Interpretation of the Settlement Is Incorrect .....................32

CONCLUSION .................................................................36

CERTIFICATE OF COMPLIANCE ........................................38

CERTIFICATE OF SERVICE.............................................39

# TABLE OF AUTHORITIES

**Page(s)**

C<span>ASES</span>

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.,*
77 F.4th 74 (2d Cir. 2023).................................................................. 28

*Bustamante v. KIND, LLC,*
100 F.4th 419 (2d Cir. 2024)............................................................. 29

*Caudle v. Sprint/United Mgmt. Co.,*
2018 WL 6618280 (N.D. Cal. Dec. 18, 2018)....................................... 33

*City of St. Paul v. FMC Corp.,*
1990 WL 265171 (D. Minn. Feb. 27, 1990) ............................ 19, 20, 21

*Doe v. Trump Corp.,*
6 F.4th 400 (2d Cir. 2021).................................................................. 28

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.,*
62 F.4th 704 (2d Cir. 2023)....................................................... *passim*

*Hatalmud v. Spellings,*
505 F.3d 139 (2d Cir. 2007) ................................................................ 5

*Hecht v. United Collection Bureau, Inc.,*
691 F.3d 218 (2d Cir. 2012) .............................................................. 22

*Ill. Brick Co. v. Illinois,*
431 U.S. 720 (1977)............................................................................. 8

*Loria v. Gorman,*
306 F.3d 1271 (2d Cir. 2002) ............................................................ 23

*McCarthy v. S.E.C.,*
406 F.3d 179 (2d Cir. 2005) .............................................................. 27

*Ohio v. American Express Co.,*
585 U.S. 529 (2018)........................................................................... 18

*In re Payment Card Interchange Fee & Merch. Disc.*
  *Antitrust Litig.*,
  735 F. Supp. 3d 249 (E.D.N.Y. 2024) ............................................ 14, 15

*In re Payment Card Interchange Fee & Merch. Disc.*
  *Antitrust Litig.*,
  No. 24-1653 (2d Cir.) ............................................................... 15

*Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*,
  762 F.3d 165 (2d Cir. 2014) .................................................... 4

*TBK Partners, Ltd. v. W. Union Corp.*,
  675 F.2d 456 (2d Cir. 1982) ......................................... 18, 20

*United States v. Aulet*,
  618 F.2d 182 (2d Cir. 1980) ............................................. 23

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005) .......................................... 16, 17

*In re World Trade Ctr. Disaster Site Litig.*,
  754 F.3d 114 (2d Cir. 2014) ............................................. 34

## OTHER AUTHORITIES

Federal Rule of Appellate Procedure 32(a) ............................................ 40

Federal Rule of Evidence 201(b) ............................................................ 23

*Payment Card Settlement – What to Do If You Disagree*,
  YouTube (Apr. 30, 2024),
  https://www.youtube.com/watch?v=K9Bj7VIfNvo ............................ 24

iii

## INTRODUCTION

Class Counsel and Defendants litigated—and then settled—a direct purchaser class action brought by merchants that contracted with acquiring banks to purchase credit card processing services. To secure Settlement approval, Class Counsel and Defendants made countless assurances to both the District Court and the Second Circuit that the Settlement would bind *only* merchants like those that brought the case: those that directly paid card-processing fees. Based on these clear and consistent representations, this Court approved the Settlement and gave the District Court a clear "marching order" for determining class membership: "identify the direct payor . . . in any given transaction." *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 718 (2d Cir. 2023); *see also id.* at 716 ("[T]he only entities that could fall within the class definition were those deemed to be direct payors of the challenged fees.").

In this appeal, Plaintiffs request a simple application of *Fikes*'s clear "marching order" to the undisputed facts. Plaintiffs, as branded gas retailers, are plainly *in*direct payors of "the challenged fees": they contract with and pay fees to their gas brands, which in turn contract

1

with and pay the merchant-discount fee directly to acquiring banks. As a result, Plaintiffs' branded sales were *never* a part of the direct-purchaser Settlement class. For Plaintiffs in this case who were *exclusively* indirect payors, that ends the inquiry and means they did not release their claims under *Fikes*.

In response to this straightforward argument, Defendants do not contend that Plaintiffs are in fact direct payors under *Fikes* with respect to their branded gas sales. Nor do they claim that *Fikes*—which involved the same dispute over Settlement class membership between branded retailers and their Suppliers—does not control here. Instead, they deny that *Fikes* means what it plainly states, ignore the "direct payor" test they themselves advocated in *Fikes*, and seek to redefine Settlement membership by reference not to established federal antitrust principles but instead to which party physically took a payment card from the consumer.

This Court should reject Defendants' alternate reality. Although Defendants paint Plaintiffs' appeal as an "attempt to evade" the Settlement, Defs.' Br. 2, the opposite is true: by rewriting 20 years of

2

litigation at the eleventh hour, it is Defendants who attempt to evade not only the Settlement but also the settled expectations of countless parties, Defendants' own binding representations to the courts, and—most importantly—the Second Circuit's express holding in *Fikes*.

Finally, Defendants fail to rebut Plaintiffs' showing that the Settlement cannot release the indirect purchaser claims of "hybrid" branded gas retailers, which are direct payors for card transactions at their ancillary businesses. On this issue, Defendants continue to ignore the critical factual differences between indirect and direct payors' claims—as well as Class Counsel's repeated admissions that they did not and could not represent indirect payors' interests—each of which precludes the Settlement from releasing Plaintiffs' indirect claims.

This Court should confirm that *Fikes* means what it says, reverse the District Court's ruling, and hold that Plaintiffs' state-law, indirect-purchaser claims are not released by the Settlement.

3

## ARGUMENT

### I.    *Fikes* Means What It Says

#### A.    *Fikes*'s Language and Reasoning Make Clear That Its "Direct Payor" Test Controls

For more than half of Defendants' brief, one would have little idea that this Court's ruling in *Fikes* exists at all. Defendants' introduction does not even mention *Fikes*, and their brief does not address its holding for 30 pages, opting to begin instead by defending the District Court's "physical acceptance" reinterpretation of the Settlement *de novo*.

The problem, of course, is that neither the District Court nor Defendants have ever been free to ignore *Fikes*'s mandate. *See Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 175 (2d Cir. 2014). And that mandate was clear: on remand, the District Court and special master were instructed to use "federal antitrust standards" to "identify the direct payor or payors in any given transaction" and deem that party the Settlement class member. *Fikes*, 62 F.4th at 718.[1] This

---

[1] Defendants' failure to acknowledge *Fikes* also undermines their proffered standard of review. According to Defendants, because the District Court undertook an "interpretation of an ambiguity in [a Settlement] agreement," this Court should apply a "clearly erroneous"

4

Court was further clear that the "direct payor" meant the "direct payors of the challenged fees," *i.e.*, the merchant discount fees, including interchange fees, challenged by the Class Plaintiffs as unlawfully inflated. *Id.* at 716; *see also id.* at 713. Class Counsel, Defendants, the District Court, and this Court all shared the understanding that this "direct payor" meant "whoever directly pays the fee to the acquirer." J.A.1211-12 at 90:25-91:20 (statement by Mastercard counsel that "whoever directly pays the fee to the acquirer" is the merchant that "accepts" cards); *see also* J.A.1199-1200 at 78:9-79:15 (statement by Class Counsel that the Settlement encompassed "only the first payer" of Defendants' fees).

When Defendants finally *do* address *Fikes*, it is not to explain its "direct payor" language, nor to suggest that the direct payor test may be harmonized with the District Court's physical acceptance test. Instead, Defendants simply deny, in *ipse dixit* fashion, that *Fikes*'s direct payor

---

standard. *See* Defs.' Br. 19. But by reinterpreting the Settlement in direct contravention of *Fikes*'s mandate, the District Court committed an error of law that this Court reviews *de novo*. *See Hatalmud v. Spellings*, 505 F.3d 139, 145 (2d Cir. 2007).

5

holding exists at all, *see* Defs.' Br. Section II.A ("*Fikes* Did Not Require a 'Direct Payor Test' to Determine Class Membership."). With *Fikes* out of the way, Defendants argue that the District Court was free to invent its physical acceptance test from scratch.

Defendants' attempt to undercut the direct payor test rings hollow in light of their many endorsements of *precisely that test* to both the District Court and this Court. *See, e.g.*, J.A.1211-12 at 90:25-91:20 (statement by Mastercard counsel at final approval that "whoever directly pays the fee to the acquirer" is the merchant that "accepts" cards); *id.* ("That's what I believe the planned administration says fairly read . . . . I think it's also true as a matter of federal antitrust law. It's the person that paid directly that has the claim."); Defs.' *Fikes* Br. 24. ("[A]s the parties have long understood about the settlement, only the merchant that is the more direct payor of the interchange fee can recover. . . . [I]t is that merchant—and no other—that is encompassed in the class definition." ).

Moreover, placed in context, *Fikes*'s direct payor language brooks no ambiguity. In fact, the *Fikes* Court was careful to clarify a) the

interpretive question presented, b) the law guiding its decision, c) the facts on which it relied, and d) its core holding. Each of these considerations makes clear that the direct payor test means what it says.

a) **Question Presented:** The *Fikes* Court began with the dispute it was resolving: as between branded retailers like Plaintiffs who "'accepted' Visa and/or MasterCard from consumers paying for the gasoline dispensed at their stations," and their Suppliers, who "'accepted' the payment cards by . . . providing operating and processing services on the same set of transactions," which entity "accepted" cards for purposes of the Settlement? *Fikes,* 62 F.4th at 715-16. In so framing the issue, the Court made clear that Defendants' "physical acceptance" alternative was an option before it—one it would reject.

b) **Governing Law:** The Court continued by observing that, although the word "acceptance" is ambiguous, the Settlement interpretation was "objectively guided by federal antitrust standards" in light of the "general rule" that "a class definition is interpreted according to the substantive law that provides the

7

basis for the class action." *Id.* (quotation omitted). In other words, because this was a federal direct purchaser antitrust case under the Sherman Act, federal direct purchaser principles— and, namely, *Illinois Brick*'s bar on indirect purchaser recovery, *see Ill. Brick Co. v. Illinois*, 431 U.S. 720, 727-29 (1977)—guided the panel's interpretation.

c) **Factual Record:** The Court then noted that this legal standard dovetailed with factual evidence of the settling parties' intent: in "view of [federal antitrust] standards," the District Court had correctly credited "Class Counsel's claim that 'they represent only . . . the direct purchaser, and not every entity in the payment chain." *Fikes,* 62 F.4th at 716. The clear intent of the settling parties thus likewise indicated that the word "accepted" must be interpreted by reference to the direct purchaser inquiry federal antitrust law requires.

d) **Holding:** The Court concluded that the settling parties' intent and backdrop principles of antitrust law spoke in one voice as to how Settlement class members must be identified: by

"identifying the direct payor for each transaction." *Id.* at 717. In so holding, *Fikes* rejected that Settlement membership turned on physical acceptance, as franchisees proffered, or on which party operated the card processing machinery, as franchisors urged. Instead, the "only marching order that matter[ed]" was which party, under federal antitrust standards, was the "direct payor" of the challenged fees. *Id.* at 718. Because there was no record evidence demonstrating which party—franchisees or franchisors—actually contracted with and paid card processing fees directly to the acquiring bank, the *Fikes* court remanded for the District Court to implement this test based on a "developed factual record." *Id.* at 727.

*Fikes*'s "direct payor" holding thus issued a simple, administrable mandate to the District Court: for a given transaction, ascertain the direct payor of the challenged fees under federal antitrust principles, and assign that merchant the Settlement claim. Knowing that they could not prevail under this inquiry, Defendants asked the District Court to reject *Fikes*, and they now ask this Court to do the same. But they cannot run

from *Fikes*'s plain language and reasoning. The Court should reaffirm that *Fikes* means what it says and reject Defendants' assault on its clear mandate.

### B. Defendants' Attempt to Rewrite *Fikes* Is Unpersuasive

With no means to distinguish *Fikes* or argue that Plaintiffs are direct payors under its holding, Defendants instead attempt to rewrite *Fikes* and ask this Court to follow the precedent they wish existed. Defendants' attempted rewrite is unpersuasive.

First, Defendants claim that *Fikes* held nothing at all. According to Defendants, *Fikes* "refrained from dictating" how to interpret the Settlement. Instead, Defendants urge, *Fikes*'s only holding—in an appeal challenging the word "accepted" in the Settlement class definition as ambiguous—was that "[w]hoever 'accepted' the payment cards is by definition in the class, gets compensation, and is bound by the release; an entity that did not accept the payment is by definition excluded from the class and is not bound by the settlement." Defs.' Br. 30-31. In other words, Defendants argue that *Fikes* was tautological: that this Court upheld the Settlement because "whoever 'accepted' the payment cards" is the merchant that "accepted" payment cards. As a result of this empty ruling,

10

Defendants argue, the District Court was free to "conduct[] an analysis" *de novo* of "which entity 'accepted' cards." *Id.* at 33 (quoting *Fikes*, 62 F.4th at 716, 727).

*Fikes*, however, was not meaningless, and did not define "acceptance" merely by reference to "which entity 'accepted' cards." Instead, this Court faced a concrete dispute between two parties— branded retailers, which physically took customers' cards, and gas brands, which processed customers' cards—each of which arguably "accepted" cards under the word's plain-English meaning. And the Court expressly resolved that ambiguity by assigning the claim to "the direct payor for each transaction." *Fikes*, 62 F.4th at 716-17. Defendants' reading absurdly renders *Fikes* a nullity by ignoring the Court's express resolution of the very ambiguity presented.

Next, unable to entirely avoid *Fikes*'s invocation of "federal antitrust standards," Defendants reimagine those standards. According to Defendants, when the *Fikes* Court stated that the word "acceptance" in the Settlement class definition must be interpreted pursuant to federal antitrust law, it referred to no more than the principle that "only one

11

'entity in the payment chain' for a given card transaction will fall within the scope of the Class." Defs.' Br. 30-31 (quoting *Fikes*, 62 F.4th at 716). But this "only one entity" principle, too, would render *Fikes* a nullity: faced with two competing claims on the same Settlement fund, Defendants read *Fikes* to hold no more than that "only one entity" may win. Again, Defendants flagrantly ignore the opinion's *actual* holding: that "federal antitrust standards" clarify that "only . . . *the direct purchaser*, and not every entity in the payment chain" falls within the class. *Fikes*, 62 F.4th at 716 (emphasis added).[2]

Unable to avoid either *Fikes*'s explicit holding or the legal principles underlying it, Defendants throw a Hail Mary. True, Defendants concede, *Fikes* may have said that the class member is the "direct payor" of the challenged fees. And true, it may have said that the "direct payor" must be determined according to federal antitrust principles. But *Fikes* never

---

[2] In fact, *Fikes*'s sole reference to Defendants' only-one-entity principle was a footnote stating that, because "[n]o party to this appeal disputes that . . . only one claimant is entitled to recover," the Court would assume it in reaching its "direct payor" holding. *Id.* at 716 n.5; *see id.* ("We therefore accept that interpretation of federal antitrust law for the purposes of this appeal, without opining on its soundness.").

expressly said that the class member was the direct payor "*to the acquiring bank*." Defs.' Br. 32. In Defendants' view, the Court's failure to specify, in the same sentence, the entity to which the class member directly paid card processing fees renders the entire test meaningless and again opens the door to a *de novo* reinterpretation by the District Court.

Not so. As Defendants are aware, the "direct payor" inquiry had *always* been defined by reference to the acquiring bank. *See* J.A.1211-12 at 90:25-91:20 (statement by Mastercard counsel that the direct payor is "whoever directly pays the fee to the acquirer").[3] *Fikes* itself adopts this same understanding. *See* 62 F.4th at 713 ("The acquiring bank, in turn, pays the merchant while charging what is known as a 'merchant discount fee.' That fee covers the interchange fee as well as an additional amount that compensates the acquiring bank for processing the transaction."); *id.*

---

[3] The *Fikes* Court's use of the term "direct payor" rather than "direct purchaser" accommodated Defendants' position that *no* merchants are direct purchasers under *Illinois Brick* because all merchants purchase card-processing services from their acquiring banks. *See* Pls.' Br. 29 n.5. Having insisted upon this precise terminology centered around the acquiring bank, Defendants cannot now use it as a shield.

13

at 716 ("[T]he only entities that could fall within the class definition were those deemed to be direct payors of the challenged fees.").[4]

Most importantly, Defendants offer no *alternative* entity, aside from the acquirer, to which *Fikes*'s "direct payor" test could refer. Instead,

---

[4] Defendants argue that enforcing *Fikes*'s "direct payor" test would "exile vast numbers of merchants from the Settlement Class" because some merchants who "indisputably belong to the Class do not pay merchant discount fees directly to acquiring banks," and "contract with third-party payment processors" or "acquirers' processing affiliates." Defs.' Br. 34. But this is disingenuous. As Defendants know, and as the very opinion they cite in support of this claim observes, "[t]ypically, merchants who wish to accept payment cards enter into agreements with acquiring banks." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 735 F. Supp. 3d 249, 256 (E.D.N.Y. 2024) ("*Lanning*"). While acquirers may use processors, all parties to the Settlement shared the understanding that those processors simply act on the acquirer's behalf, such that the class member merchant still contracts with and pays fees to the acquirer. *See, e.g.*, J.A. 1280 ("Visa and MasterCard rules require that an Acquiring Bank be a party to every Merchant contract"); *see also, e.g., id.* at 1287, 1312, 2474, 2485, 2507, 2533; *Fikes*, 62 F.4th at 731 n.1 (noting "exception[] to the *Illinois Brick* rule" when one link in payment chain is another's agent). As for merchants who use "payment facilitators" such as Square, those merchants have disputed that they are members of the direct payor class, an argument the District Court rejected and that is currently on appeal before this Court. *Lanning*, 735 F. Supp. 3d at 266; *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 24-1653 (2d Cir.). And though Defendants act in this appeal as though Plaintiffs' case is indistinguishable from the Square Sellers', both Plaintiffs' opening brief here, *see* Pls.' Br. 46-50, and Defendants' brief in the Square Sellers appeal, *see* Defs.' Square Sellers Br. 38-42, materially distinguish the two.

14

Defendants seem to argue that *Fikes*'s failure to expressly state what all parties knew—that the "direct payor" inquiry meant the direct payor of fees to the acquiring bank—nullifies the entire holding. But the meaning of *Fikes* is clear, and the Court should not indulge Defendants' sophistry.

## C. Defendants' Rewrite of *Fikes* Would Create Precisely the Intra-Class Conflicts *Fikes* Carefully Avoided

Having cast *Fikes* aside, Defendants portray the District Court's physical acceptance test as an inconsequential interpretive choice to resolve a contractual ambiguity. *See* Defs.' Br. 23-25. But *Fikes*'s "direct payor" test was not arbitrary: it avoided fundamental adequacy and intra-class conflict problems that would have arisen had Class Counsel attempted to release the claims of all parties, direct or indirect, that physically handled cards. Now that the District Court has reinstituted the physical acceptance interpretation *Fikes* rejected, these conflicts emerge in full force.

Class action plaintiffs may release claims only if (i) they "share the same integral facts as settled claims" and (ii) "the released claims are adequately represented prior to settlement." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 106 (2d Cir. 2005). From the start of this

15

litigation, Class Counsel expressly represented only merchants that directly pay fees to acquirers, and affirmatively disavowed representing indirect payors' interests. J.A.1200 at 79:9-13 ("[T]he first payer [is] all we can sue for . . . . And that's who we represent."). This express failure to protect Plaintiffs' distinct interests—wholly ignored by Defendants—is dispositive of the adequacy inquiry. *See Wal-Mart*, 396 F.3d at 110 (adequacy is evaluated by "an examination of the interests of the settling plaintiffs").

Defendants try to evade this simple conclusion by again distorting *Fikes*. According to Defendants, Plaintiffs' adequacy argument is "foreclosed" because *Fikes* already held that "branded retailers were adequately represented by the Settlement Class." Defs.' Br. 38. But *Fikes* held no such thing. Instead, *Fikes* held that *direct payors* were adequately represented by Class Counsel, 62 F.4th at 716 (crediting Class Counsel's claim that it represented "only . . . the direct purchaser"); *id.* at 717 (direct payor class members "have shared an interest in maximizing the recovery for all class members"). And because—as between branded

16

retailers and gas brands—*only* the direct payor would be included in the class, there was no adequacy issue.

But without the direct payor test, the alignment of class member interests that underpinned *Fikes*'s adequacy holding falls apart. When Class Counsel openly settled the Rule 23(b)(3) case for a half-cent on the dollar, it did so primarily because of a litigation risk unique to the "direct payor" merchants it represented—namely, the risk that *all* its class members were indirect purchasers, which would doom their federal damages claims under *Illinois Brick*. Pls.' Br. 39. As long as the Settlement encompassed *only* the most direct payors, *Fikes*'s statement that these merchants' interests were aligned and adequately represented by Class Counsel was accurate. But when the Settlement is redefined to sweep in indirect payors, that conclusion breaks down. Settling at a deep discount based on *Illinois Brick* risk is plainly contrary to the interests of indirect payors such as Plaintiffs seeking damages under the laws of states that do not follow *Illinois Brick*. Adherence to *Fikes*'s "direct payor" test is necessary to avoid this fundamental conflict. *See TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 461 (2d Cir. 1982) (law of release

17

prohibits an "advantage to the class . . . by the uncompensated sacrifice of claims of members").[5]

Defendants similarly fail to engage with the "identical factual predicate" requirement for release, instead echoing the District Court's conclusory assertion that Plaintiffs' indirect claims "depend on fundamentally the same facts" as Class Counsel's direct claims. Defs.' Br. 47 (quoting J.A.1111). But this assertion is wrong, as the core difference between a direct and indirect claim is one of fact—namely, the presence or absence of an intermediary between the violator and the purchaser. *See City of St. Paul v. FMC Corp.*, 1990 WL 265171, at *5 (D. Minn. Feb.

---

[5] Defendants argue that *Illinois Brick* was not the only litigation risk motivating Class Counsel's settlement. Defs.' Br. 40-41. But ironically, the other risk Defendants cite—the Class Plaintiffs' need to "prove harm in a two-sided market" under *Ohio v. American Express Co.*, 585 U.S. 529, 542 (2018)—reinforces the inadequate representation given to indirect payors pursuing state-law claims. That is because *Amex*'s rule is, like *Illinois Brick*, another controversial creature of federal antitrust law that may not apply to state-law, indirect purchaser claims such as Plaintiffs'. Finally, Defendants reprise their incorrect claim that "not all the Class Plaintiffs claims were vulnerable to standing challenges under *Illinois Brick*" because the Class Complaint included claims under Repealer State California's Cartwright Act. Defs.' Br. 42. But as both Class Counsel *and Defendants* confirmed to this Court, Class Counsel brought these Cartwright Act claims only "on behalf of direct purchasers and not indirect purchasers." J.A.1904 at 73:10-11; J.A.1898 at 51:12-52:3.

18

27, 1990) (holding that because "indirect claims arise out of additional purchases . . . further along the distribution chain," this leads to a "divergence of interest . . . based on a lack of an identical factual predicate" with direct claims).

Each prong of the rule governing release makes clear that the Settlement cannot release Plaintiffs' indirect purchaser claims. This conclusion holds equally true for "hybrid" Plaintiffs who purchased card acceptance services for their ancillary business sales—generally *de minimis* in comparison to their branded gas sales, *see* Pls.' Br. 65-66— directly from acquirers. As discussed at length in Plaintiffs' opening brief, the only known federal court to address this issue in the context of "hybrid" antitrust class actions invoked the Second Circuit's holding in *TBK* to reach the same outcome. *See St. Paul*, 1990 WL 265171 (releasing hybrid claimants' indirect claims would permit "an advantage to the class . . . by the uncompensated sacrifice of claims of members" (quoting *TBK*, 675 F.2d at 461)); *see* Pls.' Br. 65-69 (discussing *St. Paul*).

Without a hint of irony, Defendants respond to Plaintiffs' in-depth examination of *St. Paul* with a passing assertion that Plaintiffs cite the

19

case "without explanation or analysis," such that its holding "should be accorded no weight." Defs.' Br. 45. But Defendants cannot simply ignore Plaintiffs' brief—multiple pages of which are devoted to a careful analysis of *St. Paul*—by denying that it exists. Similarly ironic is Defendants' description of *St. Paul* as the "solitary" authority in Plaintiffs' favor, *id.*, when they do not cite a single case coming out the other way.[6]

Finally, Defendants argue that Plaintiffs' due process arguments under the law of release fail because "the appropriate course of action was to timely opt out of the Class." Defs.' Br. 15 (quoting J.A.1112). But Plaintiffs did not "decline[] to opt out." *Id.* Rather, given Class Counsel's and Defendants' consistent representations, Plaintiffs reasonably believed they were never *in* the class—until the District Court's *carte blanche* reinterpretation of the Settlement years after the opt-out

---

[6] Lacking supporting authority, Defendants instead cite a smattering of cases under unrelated statutes with unrelated fact patterns that have upheld settlement releases. But the fact that *some* settlement releases are constitutionally adequate says nothing about the permissibility of releasing Plaintiffs' claims here.

20

deadline.[7] It is this deprivation of a reasonable opportunity to opt out that, combined with the adequacy failings described above, renders the due process concerns here particularly acute. *See Hecht v. United Collection Bureau, Inc.*, 691 F.3d 218, 222 (2d Cir. 2012) (noting that damages class members "have a due process right to notice and an opportunity to opt out of class litigation").

### D. Plaintiffs' Experiences in the Claims Administration Process Demonstrate that the Settlement Does Not Include Them

The discussion above demonstrates that, for two decades prior to the District Court's reinterpretation of "acceptance," the Settlement did not include indirect payors like Plaintiffs. The on-the-ground experience of numerous Plaintiffs and similarly situated branded retailers who have tried to participate in the Settlement administration process—and been

---

[7] Defendants observe that some branded retailers—notwithstanding Defendants' own consistent representations about class membership—participated in Settlement approval proceedings. But these branded retailers were located in *Illinois Brick* Non-Repealer States; lacking any state-law cause of action, inclusion in the federal settlement was their only hope at recovery, no matter how improbable. By lumping these retailers in with branded retailers like Plaintiffs who have viable state-law claims, the District Court's Settlement reinterpretation creates yet another fundamental conflict. *See* Pls.' Br. 40 n.10.

boxed out by a claims administration system that was never designed to include them—only bolsters this conclusion.

Defendants' brief repeatedly claims that "[n]one of the Old Jericho Plaintiffs even attempted to file a claim" on the Settlement. Defs.' Br. 31 n.10; *id.* at 12 ("Appellants . . . refused to participate in the claims administration process."). This allegation, presented without citation, is demonstrably false: after the District Court rejected *Fikes* and deemed Plaintiffs class members, nearly every Plaintiff filed—or attempted to file—a Settlement claim.[8]

Defendants use their false premise in support of a false conclusion: that because Plaintiffs failed to "even attempt[] to file" claims, there are thus "no . . . competing claims" between "franchisors and franchisees" at

---

[8] As outlined in Plaintiffs' concurrently filed Motion to Supplement the Record, although "[o]rdinarily, material not included in the record on appeal will not be considered," *Loria v. Gorman*, 306 F.3d 1271, 1280 n.2 (2d Cir. 2002), equity requires giving Plaintiffs the opportunity to correct Defendants' *own* false, extra-record assertion that Plaintiffs "refused to participate" in the claims process, *see United States v. Aulet*, 618 F.2d 182, 187 (2d Cir. 1980) (supplementing record when "equity would be served"). In any event, this Court may take judicial notice of the Settlement claims administration website under Federal Rule of Evidence 201(b).

issue in the Settlement at all. Defs.' Br. 31 n.10. Plaintiffs' experiences have been quite to the contrary. When filing a claim on the approved Settlement administration website, a merchant is assigned a claim volume based on "data from the settling defendants"—namely, the merchant's account numbers *with acquiring banks and/or affiliated payment processors*.[9] Moreover, though a merchant may contest its assigned claim volume, the dispute procedure is expressly designed to identify *direct payments to acquirers*:

> The best way for you to assist the Class Administrator in locating additional Interchange Fees Paid for your business is to provide copies of monthly statements from your Merchant Services Processor . . . . This Merchant Services Processor is also sometimes called an "acquirer." The Merchant Services Processor is often a bank . . . [and] could also be a specialist firm such as Fiserv . . . .

*Id.* at 2:40. The entire Settlement process—like the entire class action for two decades until the order below—thus assumes what *Fikes* held: the

---

[9] *See Payment Card Settlement – What to Do If You Disagree*, YouTube (Apr. 30, 2024), at 0:10, https://www.youtube.com/watch?v=K9Bj7VIfNvo (Claims Administrator video demonstrating Settlement website and filing/dispute procedure).

class member is the "direct payor" of the challenged fees *to the acquirer*, and not an indirect purchaser further down the chain of transactions.

The predictable result of a process designed for direct payors is that indirect payors like Plaintiffs have been excluded. For their branded sales, Plaintiffs do not *have* Merchant Services Processor numbers, as they do not use acquiring banks—they pay fees through their gas brands. As a result, though numerous Plaintiffs have commenced the claims-filing process, their assigned claim volumes—if any—have been grossly deflated by the exclusion of their indirect payments. *See* Declaration of Kathy Sarvak ¶ 11 ("Sarvak Decl.") (Wesco, Inc. assigned claims volume missing 99.97 percent of total class period volume); Declaration of Joe C. Morris, Jr. ¶ 11 ("Morris Decl.") (Victory Energy, LLC assigned claims volume missing 99.1 percent of total class period volume). Moreover, though Plaintiffs have diligently attempted to dispute these claims by submitting their own internal revenue records, their disputes remain in limbo after months of waiting. *See* Sarvak Decl. ¶ 13; Morris Decl. ¶ 13. And significantly, Plaintiffs here are unusual among branded retailers in having counsel dedicated to litigating this precise dispute; for the

24

thousands more that lack counsel able to advise them on navigating a labyrinthine process expressly designed to exclude them, their hopes of recovery are exceedingly dim.

In light of Plaintiffs' claim-filing experiences, the Court should disregard Defendants' baseless reassurance that there are "no . . . competing claims" for "recoveries attributable to the same card transactions as between franchisors and franchisees." Defs.' Br. 31 n.10. For one, Plaintiff H&H Enterprise purchased branded gas through CHS Inc., a *class representative* in the direct payor class case that has presumably filed a claim. J.A. 1288. For another, when a branded retailer is deprived of its claim volume by a Settlement process designed to exclude it, it does not *matter* whether a gas brand has filed a claim on the same volume: because an acquirer-based claim-identifying system will simply not identify those sales, the retailer will lose its claim to the common fund even absent a conflict. While no claims administration process is perfect, the chaos branded retailers have faced demonstrates the perils of redefining a Settlement from scratch when the process is already underway.

## II.  Defendants Have Waived Any Argument That Plaintiffs *Are* Direct Payors

The *Fikes* Court concluded with its clear "marching order" to the District Court to "identify the direct payor or payors in any given transaction." 62 F.4th at 718. *Fikes*'s direct payor test was intended to be a fact-based inquiry into which entity—branded retailers or their suppliers—directly purchased card processing services from acquiring banks. *See id.* at 727. But the Court need not even reach this interpretive issue on appeal, because Defendants fail to raise, and thus forfeit, any argument that Plaintiffs are "direct payors" on appeal. *See, e.g.*, *McCarthy v. S.E.C.*, 406 F.3d 179, 186 (2d Cir. 2005) ("[A]rguments not raised in an appell[ee's] brief . . . are not properly before an appellate court."). Because Defendants devote their full brief to denying the direct payor test exists, they do not even reprise their limited arguments below that gas brands' passing-on of chargebacks, fines, and penalties renders Plaintiffs direct payors.[10]

---

[10] These arguments, in any event, were meritless. *See* Pls.' Br 49-50.

What's more, inasmuch as Defendants do discuss direct-payor status, it is to insist that it is so clear that branded retailers *are not* direct payors that—had the *Fikes* Court really meant its "direct payor" rule—it would have excluded Plaintiffs from the class on the spot. *See* Defs.' Br. 32-33. This direct endorsement of Plaintiffs' indirect-payor status—and attempt to use that status in service of their arguments—amounts not only to forfeiture but to affirmative waiver of any argument that Plaintiffs are class members under *Fikes*. *See Doe v. Trump Corp.*, 6 F.4th 400, 409 n.6 (2d Cir. 2021) ("Waiver occurs where a party intentionally relinquishes or abandons an argument.").

Defendants' sole retort to Plaintiffs' direct payor status comes in a brief footnote quoting a branded retailer's claim in a brief below that it "pay[s] interchange fees directly," which they allege creates a "genuine dispute" as to direct payor status. Defs.' Br. 24 n.8. But Defendants cannot preserve an argument through a cursory footnote, *see Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 83 n.1 (2d Cir. 2023) ("[W]e generally regard an argument as waived when it appears only in a footnote."), particularly when the body of their brief expressly disavows

27

that very argument. In any event, a branded retailer's "unsupported assertion[]" that it pays fees directly does not create a genuine factual dispute, especially as to *Plaintiffs'* situation. *Bustamante v. KIND, LLC*, 100 F.4th 419, 433 (2d Cir. 2024).

Because Defendants fail to argue that they prevail under *Fikes*'s "direct payor" test on the factual record below, this entire appeal thus turns on whether the "direct payor" test governs at all—a pure question of law that, as discussed above, resolves decisively in Plaintiffs' favor.

## III. Defendants Are Estopped from Disputing That *Fikes*'s Direct Payor Test Controls

As Plaintiffs' opening brief explains, Defendants' repeated prior endorsements of the direct payor test not only reveal their intent in settling the case but also estop their late-stage reversal of position. *See* Pls.' Br. 50-57.

Unable to escape their own prior positions, Defendants instead misrepresent Plaintiffs' position. According to Defendants, they "did not take a definitive, categorical stance as to whether branded retailers were in fact the Class members for their respective card transactions." Defs.' Br. 49. But Plaintiffs have never claimed Defendants took a categorical

28

stance on that. Instead, Defendants' "categorical stance" was that class membership was *defined* by being the "direct payors of the challenged fees." *Fikes*, 62 F.4th at 716; *see* Pls.' Br. 52 (collecting statements).

In response to these statements, Defendants claim they stated only that the direct payor "would *likely* be the proper Class member.'" Defs.' Br. 49 (emphasis added). But none of their statements before either the District Court or Second Circuit contained such a qualification. *See, e.g.*, Defs.' *Fikes* Br. 24 ("[A]s the parties have long understood about the settlement, only the merchant that is the more direct payor of the interchange fee can recover.").

Defendants' position that "neither the District Court nor the Second Circuit ever adopted" the direct payor test, *see* Defs.' Br. 50, is likewise incorrect, *see supra* Section I.A. In characteristically conclusory fashion, Defendants state that neither court's ascertainability holding was "premised on a limitation of the Class to entities that occupy a particular position in the payment chain." Defs.' Br. 50-51. Again absent from Defendants' brief is an explanation of what this Court *did* mean when it affirmed the "direct payor" test in light of Class Counsel's representation

that "they represent *only . . . the direct purchaser, and not every entity in the payment chain.*" *Fikes*, 62 F.4th at 716 (emphasis added).

Finally, Defendants dispute that the "balance of equities" supports applying estoppel. In another ironic turn of phrase, Defendants argue that estoppel would "allow Appellants to dodge the consequences of their strategic choices and litigation gambit." Defs.' Br. 51. But this supposed "gambit" again refers only to Defendants' misplaced criticism that Plaintiffs should have opted out, when Defendants and Class Counsel consistently said the class did not include indirect payors. *See supra* Section I.C. In truth, it is Defendants who have engaged in a brazen, deliberate gambit: secure Settlement approval based on their representations of a limited release, and then use that Settlement to escape liability—at no additional cost—for Plaintiffs' and other branded retailers' substantial state-law claims.

Lacking any articulable prejudice they would face by being held to their prior positions, Defendants vaguely gesture at a supposed parade of horribles: that, if Plaintiffs' claims may proceed, Defendants "may well face copycat lawsuits from innumerable other merchants seeking to

30

recover more for their claims." Defs.' Br. 52. But Defendants fail to substantiate this speculation, and after decades of litigation, only one other, discrete group of merchants—those who contract for card processing services through the "PayFac" Square—has brought state law, indirect-purchaser claims even remotely akin to Plaintiffs'. Permitting Plaintiffs' class action to proceed thus seems highly unlikely to lead to Defendants' imagined onslaught. On the other hand, permitting Defendants' bait and switch would threaten the fairness and integrity of class action settlements more broadly by setting a precedent of allowing defendants to mislead potential class members and the courts about those settlements' effects. It is precisely to prevent such abuses that courts have applied estoppel in similar circumstances. *See, e.g.*, *Caudle v. Sprint/United Mgmt. Co.*, 2018 WL 6618280, at *6 (N.D. Cal. Dec. 18, 2018) (rejecting similar "gimmick" of enforcing release against parties defendant had guaranteed would not be released). This Court should do the same.

31

## IV. Even on Its Own Terms, the District Court's Interpretation of the Settlement Is Incorrect

Finally, even if *Fikes* did not squarely control here, even if fundamental adequacy and Due Process concerns did not prohibit releasing Plaintiffs' claims, and even if Defendants were not estopped from reversing course, the District Court's interpretation of the Settlement is still wrong on its own terms.

Though the District Court erred as a matter of law by interpreting the Settlement *de novo*,[11] the Court's stated inquiry—that it would interpret the Settlement "in accordance with the parties' intent"—should have also led it to reject Defendants' release defense. J.A.1097-99 (quoting *In re World Trade Ctr. Disaster Site Litig.*, 754 F.3d 114, 122 (2d Cir. 2014)). Here, after all, every statement of the settling parties throughout the litigation had made clear their intent that "*only the merchant that is the more direct payor of the interchange fee can recover.*"

---

[11] The Court similarly erred by interpreting the Settlement agreement under New York contract law without reference to "the substantive law that provides the basis for the class action." *Fikes*, 62 F.4th at 716 (quotation omitted).

Defs.' *Fikes* Br. 24 (emphasis added).[12] This should have been the beginning and end of the Court's inquiry.

But after announcing its "party intent" test, the District Court ignored all evidence of intent in favor of its so-called "general understanding" interpretation of the term. J.A.1103. On appeal, Defendants, too, pay only brief lip service to party intent, Defs.' Br. 20, before urging an interpretation based on "the practical reality that Appellants were the entities that physically accepted consumers' payment cards," *id.* at 23.[13]

Defendants' sole counter-evidence of intent is one phrase from Class Counsel's 140-page operative complaint—a subparagraph defining the word "Merchant"—in which they contend "acceptance" was used by reference to physical handling. But even this one, years-old phrase

---

[12] *See also* Pls.' Br. 11-17 (cataloging Defendants' and Class Counsel's statements of intent to District Court and Second Circuit).

[13] Defendants also borrow a sleight of hand from the District Court: after announcing a "party intent" interpretive standard, Defendants turn to how the word "acceptance" was used not by the settling parties but by gas brands and branded retailers in their supply agreements. Defs.' Br. 20-23. When interpreting a contract, however, it is the intent of the contracting parties—Class Counsel and Defendants—that bears on the agreement's meaning. *E.g.*, *In re WTC*, 754 F.3d at 122.

(which could not possibly trump the settling parties' many unequivocal intervening statements) does not state what Defendants claim. Defendants repeatedly assert that the Class Complaint defines a "Merchant" as an "entity that accepts payments in exchange for goods or services rendered." *See* Defs.' Br. 4, 26, 27. And according to Defendants, because gas brands supposedly "do not render *any* goods or services to customers," they cannot meet the Class Complaint's "requirement that a Merchant accept cards 'in exchange for goods or services rendered.'" Defs.' Br. 27-28 (emphasis added).

Among the many problems with Defendants' intent argument is that this is not what the Class Complaint says. The full "Merchant" definition—which Defendants fail to accurately quote—is "an individual, business, or other entity that accepts payments in exchange for goods or services rendered, *as donations, or for any other reason*." J.A.1283 (emphasis added). The full definition thus states that a "merchant" may "accept[] payments" for "any reason"—and contains absolutely no "*requirement* that a Merchant accept cards 'in exchange for goods or services rendered," as Defendants misstate. Defs.' Br. 27 (emphasis

34

added). Accordingly, even if Defendants were correct that gas brands do not accept cards "in exchange for goods or services rendered"—and they are not, *see, e.g.*, Pls.' Br. 7-9—they cannot simply ignore the remainder of the merchant definition that objectively undermines their argument.

Defendants' attempt to use definitions in the Class Complaint to override the Settling parties' clear intent is particularly ironic given that the *actual* definitions in the Class Complaint—absent duplicitous rewriting—clearly support a "direct payor" interpretation of acceptance. These include:

- "Acquiring Bank" or "Acquirer" means a bank . . . that acquires payment transactions **from Merchants** . . . . **Visa and MasterCard rules require that an Acquiring Bank be a party to every Merchant contract.**

- Interchange Fee" means **a fee that Merchants pay to the Issuing Bank through the Network and the Acquiring Bank** for each retail transaction in which the Issuer's card is used . . . **at one of the Acquirer's Merchant accounts**.

- "Merchant-Discount Fee" is **the total sum that is deducted from the amount of money a Merchant receives in the Settlement of Visa and/or MasterCard transactions.**

J.A.1280-82 (emphasis added). As each of these definitions makes clear, Merchant status was defined *from the outset* by reference to acquiring banks and the merchant-discount fee—and "Class Members" were those

35

that had interchange fees deducted "through the Network and the Acquiring Bank." Thus, to the extent the Court considers the Class Complaint, it simply confirms what all parties had always known until the opinion below upset those settled expectations: the class-member merchant is the *direct payor of the challenged fees to the acquiring banks*.

## CONCLUSION

For the foregoing reasons, the judgment and opinion below should be vacated and the case remanded with instructions to grant Plaintiffs' motion for partial summary judgment.

DATED: May 8, 2025         Respectfully Submitted,

*/s/ Christopher J. Bateman*

Christopher J. Bateman
Daniel Gifford
COHEN MILSTEIN SELLERS &
TOLL PLLC
88 Pine St., 14th Floor
New York, NY 10005
Tel: (212) 838-7797
Fax: (212) 838-7745
cbateman@cohenmilstein.com
dgifford@cohenmilstein.com

Manuel J. Dominguez
COHEN MILSTEIN SELLERS &
TOLL PLLC
11780 U.S. Highway One
Suite N500
Palm Beach Gardens, FL 33408
Tel: (561) 515-2604
Fax: (561) 515-1401
jdominguez@cohenmilstein.com

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because it contains 6,975 words, excluding the parts of the brief exempted by Rule 32(f).  I relied on the word count of Microsoft Word in preparing this certificate.

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because the brief – in both its text and its footnotes – has been prepared in 14-point Century Schoolbook font.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 8, 2025                         s/ *Christopher J. Bateman*
                                                      Christopher J. Bateman

38

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2025, this brief was served on all parties via ACMS.


Dated: May 8, 2025                    s/ *Christopher J. Bateman*
                                      Christopher J. Bateman